307 F.3d 964
 SOUTHWEST CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation; Forest Guardians, Plaintiffs-Appellants, and
Southwest Trout, a non-profit corporation; Sky-Island Watch, an unincorporated association, Plaintiffs,
Arizona Cattle Growers' Association, an Arizona non-profit corporation; Coalition of Arizona and New Mexico Counties for Stable Economic, a non-profit organization; Catron County, New Mexico; James K. Chilton; Susan E. Chilton, Intervenors,
v.
UNITED STATES FOREST SERVICE; John Bedell, Apache-Sitgreaves National Forest Supervisor; Fred Trevey, Coconino National Forest Supervisor; John McGee, Colorado National Forest Supervisor; Abel Camarena, Gila National Forest Supervisor; Mike King, Prescott National Forest Supervisor; Charles Bazan, Tonto National Forest Supervisor, Defendants-Appellees,
v.
Abe Martinez; Lydia Martinez; Daniel Glickman; Michael Dombeck; Eleanor Towns; Bruce Babbit; Jamie Rappaport Clark; Nancy Kaufman, Cross-Defendants-Appellees.
Southwest Center for Biological Diversity, a non-profit corporation; Southwest Trout, a non-profit corporation; Sky-Island Watch, an unincorporated association, Plaintiffs-Appellees,
Arizona Cattle Growers' Association, an Arizona non-profit association, Intervenor-Appellant, and
Coalition of Arizona and New Mexico Counties for Stable Economic, a non-profit organization; Catron County, New Mexico; James K. Chilton; Susan Chilton, Intervenors,
v.
United States Forest Service, and in their official capacities: John Bedell, Apache-Sitgreaves National Forest Supervisor; Fred Trevey, Coconino National Forest Supervisor; John McGee, Coronado National Forest Supervisor; Abel Camarena, Gila National Forest Supervisor; Mike King, Prescott National Forest Supervisor; Charles Bazan, Tonto National Forest Supervisor, Defendants-Appellees,
v.
New Mexico Cattle Growers Association, Cross-Claimant-Appellee,
v.
Abe Martinez; Lydia Martinez; Daniel Glickman; Micheal Dombeck; Eleanor Towns; Bruce Babbit; Jamie Rappaport Clark; Nancy Kaufman, Cross-Defendants-Appellees.
 No. 01-16092.
 No. 01-16277.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 8, 2002.
 Filed October 2, 2002.
 
 COPYRIGHT MATERIAL OMITTED Susan D. Daggett of Earthjustice Legal Defense Fund, Denver, CO, for the plaintiffs-appellants-appellees.
 
 
 1
 Sandra Slack Glover of the Department of Justice, Washington, DC, for the defendants-appellees.
 
 
 2
 Norman D. James of Phoenix, AZ, for the defendants-intervenors-appellees-appellants.
 
 
 3
 Karen Budd-Falen, Marc Stimpert, Budd-Falen Law Offices, Cheyenne, WY, for Coalition of Arizona, New Mexico Counties for Stable Economic, Catron County, New Mexico and New Mexico Cattle Growers Ass'n.
 
 
 4
 Appeal from the United States District Court for the District of Arizona; John M. Roll, District Judge, Presiding.
 
 
 5
 Before CANBY, and RYMER, Circuit Judges, and BERTELSMAN, Senior District Judge.*
 
 OPINION
 
 6
 BERTELSMAN, District Judge.
 
 
 7
 This case involves a dispute over the impact of livestock grazing on the habitat of the loach minnow, a threatened species of fish, in certain allotments of land in the southwest region of the United States. Plaintiffs/appellants Forest Guardians and the Center for Biological Diversity[1] (together "appellants"), are non-profit corporations actively involved in species protection issues throughout the southwestern United States.
 
 
 8
 Defendant/appellee United States Forest Service is a federal agency within the United States Department of Agriculture which has responsibility for administering and protecting public lands. In this matter it is the action agency.
 
 
 9
 The Secretary of Interior has responsibility for the loach minnow as a threatened species. The Secretary has delegated primary responsibility to defendant/appellee United States Fish and Wildlife Service to assist the Forest Service in determining whether any proposed action by the Forest Service is likely to impact the loach minnow. 50 C.F.R. § 402.13.
 
 
 10
 Intervenor-appellee New Mexico Cattle Growers' Association and intervenor/cross appellant Arizona Cattle Growers' Association are non-profit, membership associations. Their purposes include advancement of the economic, political and legal interests of the cattle industry in their respective states. Many of the allotments at issue include land where their members graze livestock.
 
 
 11
 Appellants appeal the district court's refusal to grant injunctive relief in this Endangered Species Act case involving the consultation process under Section 7(a) and Section 7(d) of the Act. Appellants argue that due to substantial procedural violations, the district court was required to issue an injunction halting grazing until the consultation process was completed.
 
 
 12
 The Arizona Cattle Growers' Association filed a cross appeal arguing that the appellants failed to meet mandatory notice requirements after filing amended complaints.
 
 
 13
 * The Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq., has both substantive and procedural provisions designed to protect endangered species and their habitats. These provisions are triggered when a species is listed as endangered[2] or threatened.[3] 16 U.S.C. § 1533. Section 7(a)(2) of the ESA requires federal agencies to "insure that any action[4] authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of[5] any endangered species or threatened species...." 16 U.S.C. § 1536(a)(2). Hence, the agency (here, the Forest Service) must first determine whether the action at issue "may affect" species listed as threatened or endangered under the ESA. If the Forest Service's action may affect a listed species, then it must consult with either the Secretary of Interior or the Secretary of Commerce. In the present case, the Secretary of Interior has responsibility for the species at issue and has delegated primary responsibility for the species to the Fish and Wildlife Service. 50 C.F.R. § 402.01(b).[6] This process is referred to as "informal consultation"[7] and simply describes the discussions and correspondence between the Fish and Wildlife Service (as the designee for the Secretary of Interior) and the Forest Service in determining whether its proposed action is likely to impact listed species or critical habitat. 50 C.F.R. § 402.13. The informal consultation stage is optional. Id. at § 402.13. The purpose of the informal consultation is to assist the Forest Service in determining whether formal consultation is required. Id. If during informal consultation, it is determined by the Forest Service, with the written concurrence of the Fish and Wildlife Service, that the action is not likely to adversely affect listed species, the consultation process is terminated and no further action is necessary. Id.
 
 
 14
 On the other hand, if the Forest Service and the Fish and Wildlife Service cannot reach concurrence on this issue, or if the Forest Service and Fish and Wildlife Service agree that the action is likely to adversely affect a listed species, formal consultation must take place. Id. at §§ 402.13-402.14. Formal consultation begins with a written request by the Forest Service as the action agency to initiate formal consultation and ends with issuance of a biological opinion by the Fish and Wildlife Service. Id. at § 402.14. The purpose of the biological opinion is to assess whether the proposed agency action is likely to jeopardize the continued existence of species that are listed. Id. at § 402.02(d). The "[b]iological opinion is the document that states the opinion of the [Fish and Wildlife Service] as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification[8] of critical habitat." Id. If so, the Fish and Wildlife Service must determine whether "reasonable and prudent alternatives" exist to allow the Forest Service to avoid a jeopardy situation and thereby comply with the ESA. Id. at § 402.14(g).
 
 
 15
 Section 7(d) of the ESA provides that "[a]fter initiation of consultation ..., the Federal agency ... shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate[Section 7(a)(2)]." 16 U.S.C. § 1536(d). Appellants contend that section 7(d) should not be construed to allow grazing during the consultation process.
 
 II
 
 16
 This consolidated lawsuit was originally filed by appellants against the Forest Service seeking to enjoin cattle grazing on certain areas during the consultation period required under the Endangered Species Act due to the presence of the loach minnow, a threatened species of fish.[9] Appellants maintain that the grazing adversely impacts the loach minnow because the fish use the spaces between substrates or underlying layers for resting and spawning and are rare or absent from habitats where fine sediments fill the interstitial spaces. Livestock grazing can remove vegetation that otherwise would help stabilize soils and filter sediments from runoff which then leads to increased sedimentation in nearby watersheds.
 
 
 17
 In response to the lawsuits, in early 1998, the Forest Service initiated consultation with the Fish and Wildlife Service. The purpose of the consultation was to determine the potential effects of livestock grazing on the habitat of the endangered and threatened species within the allotments and whether formal consultation between the Forest Service and the Fish and Wildlife Service was necessary.[10]
 
 
 18
 Relevant to this appeal is the district court's judgment for the appellants on their claims with respect to the allotments on which the Forest Service had voluntarily re-initiated consultation. The district court found that although the Forest Service consulted on these allotments, its determinations were withdrawn because they were inconsistent with the Guidance Criteria.[11] The district court found that the Forest Service never completed consultation on these allotments and judgment was entered for appellants. However, the court declined to enjoin grazing on those allotments pending completion of the consultation because there had not been a sufficient showing of irreparable harm. Additionally, the district court balanced the hardships between the parties.
 
 
 19
 The district court also considered whether continued grazing during the consultation period would violate Section 7(d) of the ESA. The court afforded "no weight" to the Forest Service's declarations that grazing was consistent with Section 7(d), but based on a review of the record, found that "despite allowing cattle grazing to continue, conditions on these allotments are improving."
 
 
 20
 When reviewing a district court's decision to deny an injunction, this court uses two different standards of review. Walters v. Reno, 145 F.3d 1032, 1047 (9th Cir.1998), cert. denied, 526 U.S. 1003, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999) (citing Toussaint v. McCarthy, 801 F.2d 1080, 1087 (9th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987)). This court reviews the legal conclusions under a de novo standard, while deferring to the district court's factual findings unless they are clearly erroneous. Id.
 
 III
 
 21
 Appellants argue that if there is a substantial procedural violation of ESA, the Act always requires an injunction. They further contend that because of this, it was error for the district court to make a finding on the likelihood of irreparable harm and engage in balancing the hardships. Appellants contend that the burden on them to demonstrate that injunctive relief is necessary is low and that injunctive relief is automatic under the facts of this case. Appellees argue that injunctive relief is not automatically required by the ESA prior to completion of the consultation process.
 
 
 22
 The United States Supreme Court has held that "Congress intended endangered species to be afforded the highest of priorities."[12] Tennessee Valley Authority v. Hill, 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In Tennessee Valley Authority, the Supreme Court approved an injunction preventing the operation of the Tellico Dam, a $100 million project, because it was undisputed that the dam would jeopardize the existence and destroy the habitat of the snail darter, an endangered species.
 
 
 23
 Numerous courts have interpreted Tennessee Valley Authority in a variety of ways. However, at least one proposition is clear from Tennessee Valley Authority — the traditional test for preliminary injunctions is not the test for injunctions under the ESA. See e.g., National Wildlife Federation v. Burlington Northern R.R., 23 F.3d 1508, 1510 (9th Cir.1994) (citations omitted). "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." Id. at 1511 (citing Friends of the Earth v. United States Navy, 841 F.2d 927, 933 (9th Cir.1988) (quoting Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir.1987))). Instead, courts have held that "[t]he `language, history, and structure' of the ESA demonstrate Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species." National Wildlife Federation, 23 F.3d at 1511 (citing Tennessee Valley Authority, 437 U.S. at 174, 98 S.Ct. 2279; Friends of the Earth, 841 F.2d at 933; Marsh, 816 F.2d at 1383). Hence, a court's discretion in weighing the balance of hardships is limited in ESA cases.
 
 
 24
 Nonetheless, a violation of the ESA does not always lead to the automatic issuance of an injunction. Biodiversity Legal Foundation v. Badgley, 284 F.3d 1046, 1056 (9th Cir.2002) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)); see also National Wildlife Federation, 23 F.3d at 1511 (citing Tennessee Valley Authority, 437 U.S. at 193, 98 S.Ct. 2279). "[W]hen federal statutes are violated, the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute." Badgley, 284 F.3d at 1056-57 (citing Tennessee Valley Authority, 437 U.S. at 194, 98 S.Ct. 2279). "Accordingly, injunctive relief under the ESA is generally mandated where the moving party 1) has had or can likely show `success on the merits,' and 2) makes the requisite showing of `irreparable injury.'" Greenpeace v. National Marine Fisheries Service, 106 F.Supp.2d 1066, 1072 (W.D.Wash.2000). It is this "irreparable injury" standard that is presently at issue.
 
 
 25
 The seminal case for injunctive relief under ESA Section 7 in the Ninth Circuit is Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir.1985), wherein the court held that "[g]iven a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction of the project pending compliance with the ESA." Under Section 7:
 
 
 26
 Congress has assigned to the agencies and to the Fish & Wildlife Service the responsibility for evaluation of the impact of agency actions on endangered species, and has prescribed procedures for such evaluations. Only by following the procedures can proper evaluations be made. It is not the responsibility of plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed.
 
 
 27
 Greenpeace, 106 F.Supp.2d at 1073 (quoting Thomas, 753 F.2d at 765) (emphasis added in Greenpeace).
 
 
 28
 In Greenpeace, the defendants urged the court to adopt a proposition that substantial compliance with ESA Section 7 is only at issue upon an additional showing of likely future harm. The court in Greenpeace rejected this proposition. 106 F.Supp.2d at 1074-75.
 
 
 29
 A recent case by the Ninth Circuit provides further support for the holding in Greenpeace, Thomas, and the proposition urged by appellants in this matter. See Badgley, 284 F.3d at 1057. In Badgley, this court again reiterated that no balancing of equities is required.
 
 
 30
 Further in Badgley, 284 F.3d at 1057, we clearly interpreted Tennessee Valley Authority, 437 U.S. at 193-95, 98 S.Ct. 2279 as holding that "effectuating Congress' clear intent required issuance of an injunction, regardless of the equities involved." This court thereafter stated that both it and the United States Supreme Court have ruled that an injunction must issue when the acting agency fails to comply with Section 7. Badgley, 284 F.3d at 1057 ("While neither this court nor the Supreme Court has yet ruled that an injunction must issue when the Service fails to comply with Section 4 of the ESA, as it has for violations of Section 7, Congress' purpose for passing the ESA applies to both provisions.") (emphasis added). Where the agency has failed to comply with Section 7 of the ESA:
 
 
 31
 Congress has established procedures to further its policy of protecting endangered species. The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protections. Only by requiring substantial compliance with the act's procedures can [the court] effectuate the intent of the legislature.
 
 
 32
 Id. (citing Marsh, 816 F.2d at 1384).
 
 
 33
 The district court agreed with appellants that the Forest Service had never completed consultation on the allotments at issue, and hence, appellants fulfilled the "success on the merits" requirement. However, the court went on to make a finding that even with the procedural violations, there had not been a sufficient showing of irreparable harm.
 
 
 34
 This case does not present a `substantial procedural violation' of the sort that required an injunction in Thomas and Badgley. While courts must generally impose an injunction given a procedural violation of ESA, this case fits a narrow exception.
 
 
 35
 We believe that Marsh, 816 F.2d 1376, carves out an exception for cases such as the present one. In Marsh we held that "Congress intended that the consultation process would operate so as to prevent substantive violations of the act." Id. at 1389 (citation omitted). Thereafter, we found that the protections afforded in Section 7(d) continue until the requirements of Section 7(a) are met. Thus, with respect to non-jeopardizing activities, we held that after consultation was reinitiated in Marsh, the parameters of Section 7(d) would govern the ongoing action. Id. This supports a conclusion that non-jeopardizing agency action may take place during the consultation process in light of the protections of Section 7(d) where the action will not result in substantive violations of the act.
 
 
 36
 Furthermore, both the present case and Marsh are distinguishable from Thomas on one important point — in Thomas the procedural violation included nothing from which the agency, nor the court, could make any determination of how the action impacted the species or whether the action put the endangered species in jeopardy. In the case at hand, as in Marsh, there was evidence in the record for the court to review the impact on the species during the consultation period. The district court noted that the Forest Service was taking mitigating measures to ensure that the cattle grazing would have little, if any, impact on the loach minnow while formal consultation was taking place. Cattle were excluded from riparian areas, and these areas were being monitored. The consultation was ongoing and was nearing completion. The district court also found that the record supported a finding that the conditions were actually improving given the protective measures that had already been undertaken. These measures do fulfill the purpose of the act as required under Badgley, which is to provide protection to endangered and threatened species.
 
 
 37
 We do not hold today that in all cases where there has been a procedural violation during the consultation phase injunctive relief is not appropriate. Instead, we limit our holding to the facts in this case.
 
 
 38
 The record supports the district court's conclusion that the loach minnow is not likely to be harmed during the consultation period. Additionally, there is no irreversible commitment of resources that would foreclose reasonable and prudent alternatives should these be suggested in a biological opinion at the conclusion of consultation. Livestock grazing is flexible and can be altered during the process if necessary. This case is not one where once the action is initiated there can be no turning back, as in a case where timber is cut, or wherein the action will unquestionably make it unlikely that the species will survive, such as in Tennessee Valley Authority, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117.
 
 
 39
 This is true, even taking into consideration appellants' argument that the district court stated that the livestock were excluded from "watershed" as compared to riparian zones. Any error in using the correct term is harmless, however, because the evidence supports a finding that the exclusion of livestock from certain areas (regardless of the correct term) would not cause irreversible and irretrievable commitment of resources and would not adversely impact the loach minnow.
 
 
 40
 Further, although the appellants argue that the district court erred in relying on the Forest Service's unilateral determination that continued grazing would comply with Section 7(d), a review of the district court's opinion clearly shows that it gave the Forest Service's determinations no weight in any event. Instead, the district court reviewed the record evidence and made its own conclusion of no harm. We conclude that the district court's factual findings are not clearly erroneous.
 
 
 41
 Appellants also argue that the district court's balancing of harm in considering the economic hardship to ranchers was improper. While we agree this was impermissible, it is only harmless error given the absence of likely adverse effects of continued grazing on the loach minnow.
 
 
 42
 In light of the foregoing and the mechanisms in place to protect the loach minnow during the consultation phase, we hold that it was not error for the district court to deny injunctive relief in this matter.
 
 IV
 
 43
 Appellants also argue that the Forest Service's reliance on Section 7(d) to allow grazing during consultation is one that is "capable of repetition, yet evading review." As a prerequisite to the exercise of jurisdiction in this matter, this court must be satisfied that the case is not moot. Badgley, 284 F.3d at 1053 (citations omitted). An actual controversy must exist at all stages of the litigation. Id. If a controversy no longer exists, the case is moot. Id.
 
 
 44
 The United States Supreme Court has carved out an exception to the general principle of mootness for cases in which the challenged conduct is capable of repetition but evades review. Alaska Center for the Environment v. United States Forest Service, 189 F.3d 851, 854 (9th Cir.1999) (citing Weinstein v. Bradford, 423 U.S. 147, 148-49, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). "In determining if an issue satisfies the repetition/evasion exception, [this court] has recognized that `evading review' means that the `underlying action is almost certain to run its course before either this court or the Supreme Court can give the case full consideration.'" Alaska Center, 189 F.3d at 855 (quoting Miller v. California Pacific Med. Ctr., 19 F.3d 449, 453-54 (9th Cir.1994)).
 
 
 45
 At the time of oral argument in this matter, consultation was still at issue on three remaining allotments. Hence, there remains a live controversy as to these allotments, and accordingly, this is not a matter which evades review.[13]
 
 V
 
 46
 The Arizona Cattle Growers' Association (ACGA) filed a cross-appeal alleging that the district court lacked jurisdiction to decide appellants' claims against the Forest Service for failure to meet jurisdictional notice requirements. The ACGA challenges jurisdiction at this stage, too.
 
 
 47
 The ESA in citizens' suits, such as the one at hand, requires that such may not commence until sixty days' written notice has been given to the Secretary and to any alleged violators. 16 U.S.C. § 1540(g)(2)(A)(i). This notice requirement is jurisdictional. American Rivers v. National Marine Fisheries Service, 126 F.3d 1118, 1125 (9th Cir.1997) (citing Save the Yaak Committee v. Block, 840 F.2d 714, 721 (9th Cir.1988)). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 520 (9th Cir.1998) (citing Lone Rock Timber Co. v. U.S. Dept. of Interior, 842 F.Supp. 433, 440 (D.Or.1994)).
 
 
 48
 Presently, the ACGA alleges that appellants failed to give the requisite sixty days' notice after their amended complaints, filed in 2000, added new claims challenging the Forest Service's effects findings on the allotments at issue and challenging the Fish and Wildlife Service's biological opinions as arbitrary and capricious. The ACGA contends that the lower court erred in applying the Administrative Procedure Act to the "No Effect" and the "May Affect, Not Likely to Adversely Affect" findings.
 
 
 49
 The Administrative Procedure Act does not require sixty days' notice. It authorizes courts to set aside agency action found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. American Rivers, 126 F.3d at 1125 (citing 5 U.S.C. § 706). A challenge under the Administrative Procedure Act may be brought only to challenge final agency action.
 
 
 50
 In Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), as cited in American Rivers, 126 F.3d at 1125, the Court held that claims challenging the adequacy of biological opinions against the Secretary of Interior, when acting in his capacity as Administrator of the ESA are not properly pled as citizen suit claims under Section 11(g)(1)(A) of the Act. The Court held that such claims could be pled under the Administrative Procedure Act instead. Id. Hence, as to the claims pled by the appellants in their third amended complaint regarding the biological opinion, the district court was correct in applying the Administrative Procedure Act.[14]
 
 
 51
 However, on other "new" claims in the third amended complaint, the appellants are challenging the Forest Service's findings made during the consultation process, not the findings of the Fish and Wildlife Service, which would not be final agency action. Hence, ACGA is correct that the Administrative Procedure Act is not applicable to these claims. Nonetheless, this seems to be harmless error as the additional claims are not "new claims" requiring new notice. Instead, the claims are based on the process of consultation, and the Forest Service's alleged errors in completing this process. The consultation period clearly includes a process by which findings are made as to the effects of the agency action on the species at issue. This is simply part of the consultation period and should not be construed as separate from the consultation process itself. Certainly, the Forest Service would not have reasonably interpreted the initial complaint at issue as one that simply sought consultation in and of itself regardless of the validity of the consultation. Instead, it is the completion of the consultation process in accord with the relevant statutes and regulations that give it force and meaning. We conclude that the Forest Service was on notice that its consultations would be carried out in accordance with the relevant statutes and regulations and would not be flawed. Accordingly, no new notice was required, and we have jurisdiction over this matter.[15]
 
 
 52
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 At the initiation of this lawsuit, the Center for Biological Diversity was named the Southwest Center for Biological Diversity. It was subsequently re-named the Center for Biological Diversity
 
 
 [2]
 An endangered species is one which "is in danger of extinction." 16 U.S.C. § 1532(6)
 
 
 [3]
 A threatened species is one which is "likely to become an endangered species within the foreseeable future."Id. § 1532(20). A species may be listed as endangered or threatened based upon any one or more of the five following factors:
 (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
 (B) overutilization for commercial, recreational, scientific, or educational purposes;
 (C) disease or predation;
 (D) the inadequacy of existing regulatory mechanisms; or
 (E) other natural or manmade factors affecting its continued existence.
 Id. § 1533(a)(1).
 
 
 [4]
 The term "action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies.... Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02
 
 
 [5]
 "Jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02
 
 
 [6]
 We will therefore refer to FWS where a reference includes action by the Secretary of Interior
 
 
 [7]
 The term "informal consultation" is not specifically mentioned in the ESA
 
 
 [8]
 The term "destruction or adverse modification" is defined as "a direct or indirect altercation that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." 50 C.F.R. § 402.12
 
 
 [9]
 Other species which were included in the original complaint are no longer at issue
 
 
 [10]
 At the time of oral argument, consultation was at issue on only three remaining allotments. On the Mangas allotment, appellants concede that the prior invalid consultation has been superseded and voluntarily dismissed this challenge
 
 
 [11]
 The Forest Service developed a set of "Grazing Guidance Criteria for Preliminary Effects Determinations for Species Listed as Threatened, Endangered, or Proposed for Listing" for classifying each allotment based on the likely effect of grazing on the listed species. The FWS, after some amendments, concurred with the Forest Service's use of these Guidance Criteria. The three categories of possible effect determinations were "No Effect," "May Affect, Not Likely to Adversely Affect" (NLAA), and "May Affect, Likely to Adversely Affect" (LAA)
 
 
 [12]
 The appellees do not dispute this point
 
 
 [13]
 For the reasons stated within this section of the opinion, the court hereby grants the Forest Service's Motion to Dismiss on appellants' claims as to six allotments on which consultation was completed prior to oral argument in this matter. These allotments are: Dry Creek, Harve Gulch, Alma, Black Bob, Devil's Park, and Frisco Park
 
 
 [14]
 This is claim two in the third amended complaint
 
 
 [15]
 Appellants filed a Motion to Submit Notice Letter to supplement the record on appeal. This court narrowly construes F.R.A.P. 10(e) and normally will not allow the record on appeal to be supplemented with material not considered by the trial courtDaly-Murphy v. Winston, 837 F.2d 348, 351 (9th Cir.1987) (citations omitted). Therefore, this motion is hereby denied.
 CANBY, Circuit Judge, dissenting:
 I respectfully dissent because I conclude that grazing on the allotments in issue should have been enjoined pending consultation. A word of explanation is necessary.
 Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires each federal agency, "in consultation with and with the assistance of the Secretary, [to] insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the species' critical habitat. The Secretary has delegated his consultation role to the Fish and Wildlife Service, which is the expert agency entrusted with the crucial determination of likelihood of jeopardy.
 In Thomas v. Peterson, 753 F.2d 754 (9th Cir.1985), we held that, absent unusual circumstances, an injunction is the appropriate remedy for a substantial violation of the procedural requirement of section 7(a)(2) of the Act. In the present case, however, the majority opinion holds that an injunction is not necessary because there was sufficient evidence in the record to permit the district court to find that no harm was likely to come to the loach minnow while the consultation process was being completed. But it is not for the district court to make this determination. As we said in Thomas:
 The Forest Service would require the district court, absent proof by the plaintiffs to the contrary, to make a finding that the Jersey Jack road is not likely to effect [sic] the Rocky Mountain Gray Wolf, and that therefore any failure to comply with ESA procedures is harmless. This is not a finding appropriate to the district court at the present time. Congress has assigned to the agencies and to the Fish & Wildlife Service the responsibility for evaluation of the impact of agency actions on endangered species, and has prescribed procedures for such evaluation. Only by following the procedures can proper evaluations be made. It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed.
 Id. at 765.
 The requirement of section 7(a)(2) makes little sense if it is deemed to be satisfied by the initiation of consultation. The purpose of consultation is to reach its result—a determination by an expert agency whether an endangered or threatened species is likely to be jeopardized. Thus agency action should be forestalled until the consultation process has reached a result. The majority opinion here correctly states that section 7(a)(2) applies during the consultation process, and that agency action before completion of consultation constitutes a procedural violation of that statute. The majority believes that the district court can make environmental findings that make an injunctive remedy unnecessary; for reasons just stated I conclude that Thomas precludes that procedure.
 The majority relies in part on Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir.1987). I confess that Marsh gives me pause, because it held that an injunction to enforce section 7(a)(2) was required up to the initiation of consultation, at which time "the statutory prohibition of section 7(d) will apply." Id. at 1389. One interpretation of this language would be that section 7(a)(2) ceases to have force (at least to support an injunction) once consultation begins, and the only environmental protection thereafter must come from section 7(d), 16 U.S.C. § 1536(d). Section 7(d) prohibits an agency from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [section 7(a)(2)]." Id.
 I do not interpret Marsh or the statutory scheme this way, nor does the majority opinion here. Section 7(d) certainly supplements section 7(a)(2) once consultation begins, but it does not, in my view, weaken the requirement of section 7(a)(2) that consultation be completed before action is taken. For example, I do not believe that section 7(a)(2) would permit actions that might threaten members of endangered species even if those actions were reversible and thus not within the proscription of section 7(d). As a practical matter, of course, the force of sections 7(a)(2) and 7(d) will frequently be congruent during a period of consultation, and an agency action that would violate one section would violate the other. My point is simply that the availability of section 7(d) is no reason to hold that an injunction to enforce section 7(a)(2) should not be kept in force until consultation is completed. I therefore read Marsh as holding that, in the circumstances of that case, an injunction was unnecessary, not as holding that section 7(a)(2) could not support one.
 As I read the majority opinion, it does not disagree with my reading of Marsh or my understanding that section 7(d) complements, rather than replaces, section 7(a)(2) during consultation. Where we part company is that the majority holds that the district court may make the necessary interim biological finding and deny an injunction pending consultation. I conclude that Thomas and the rationale of section 7(a)(2) preclude this approach, and on that point I dissent.